AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original   ☐ Duplicate Original



# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America | |
| v. | |
| Luis Ramirez, | |
| Jonathan Rubalcaba Alarcon, | Case No. 5:24-MJ-00195 |
| aka, "Demon," | |
| Gilbert Rey Martinez, | |
| akas, "Bams" and "Bam Bam," | |
| Defendant(s) | |

FILED
CLERK, U.S. DISTRICT COURT

**5/2/24**

CENTRAL DISTRICT OF CALIFORNIA
BY:        KC        DEPUTY

LODGED
CLERK, U.S. DISTRICT COURT

**5/2/2024**

CENTRAL DISTRICT OF CALIFORNIA
BY:        nm        DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of September 27, 2023 in the county of Riverside in the Central District of California, the

defendants violated:

|  *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 1201(a)(1); 2(a) | Kidnapping and Aiding and Abetting |

This criminal complaint is based on these facts:

 *Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
/s/
*Complainant's signature*

Benjamin J. Beck, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:     May 2, 2024           _____
                                 *Judge's signature*

City and state:   Riverside, California      Hon. Sheri Pym, U.S. Magistrate Judge
                                             *Printed name and title*

AUSA: Peter Dahlquist

**AFFIDAVIT**

I, Benjamin J. Beck, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrants against Luis Ramirez ("RAMIREZ"), also known as "Lil Man," Jose Jonathan Rubalcaba Alarcon ("RUBALCABA"), also known as "Demon," and Gilbert Rey Martinez ("MARTINEZ"), also known as "Bams," also known as, "Bam Bam," for violations of 18 U.S.C. §§ 1201(a)(1) (Kidnapping) and 2(a) (Aiding and Abetting).

2.    This affidavit is also made in support of a criminal complaint and arrest warrant against Matthew Retamoza ("RETAMOZA") for a violation of 18 U.S.C. § 3 (Accessory After the Fact to Kidnapping).

3.    This affidavit is also made in support of an application for a warrant to search Rubidoux Fashion, located at 5582 Mission Boulevard, Riverside, California ("RUBIDOUX FASHION") as described more fully in Attachment A-1.

4.    This affidavit is also made in support of an application for a warrant to search the following digital devices, in the custody of the Federal Bureau of Investigation, in Riverside, California, as described more fully in Attachment A-2:

        a.    A dark blue Nokia cellular phone with a cracked screen bearing Riverside Sheriff's Department barcode 2631107, located in Riverside, California, seized by the Riverside County

Sheriff's Department in on September 8, 2023 ("SUBJECT DEVICE 1");

b.    A silver iPhone cellular phone in a red case bearing Riverside Sheriff's Department barcode 2631108, located in Riverside, California, seized by Riverside County Sheriff's Department on September 8, 2023 ("SUBJECT DEVICE 2");

c.    A blue Nokia cellular phone bearing Riverside County Sheriff's Department evidence barcode number 2599664, located in Riverside, California, seized by the Riverside County Sheriff's Department in Jurupa Valley on September 8, 2023 ("SUBJECT DEVICE 3");

d.    A black TCL cellular phone bearing Riverside County Sheriff's Department evidence barcode number 2599665, located in Riverside, California, seized by Riverside County Sheriff's Department in Jurupa Valley on September 8, 2023 ("SUBJECT DEVICE 4");

e.    An iPhone cellular phone with a black case bearing Riverside County Sheriff's Department evidence barcode number 2599666, located in Riverside, California, seized by Riverside County Sheriff's Department in Jurupa Valley on September 8, 2023 ("SUBJECT DEVICE 5");

f.    A blue Motorola Cellular Phone with a cracked screen bearing Riverside County Sheriff's Department evidence barcode number 2599667, located in Riverside, California, seized by Riverside County Sheriff's Department in Jurupa Valley on September 8, 2023 ("SUBJECT DEVICE 6");

g.    A black TCL Cellular Phone with a cracked screen bearing Riverside County Sheriff's Department evidence barcode number 2599668, located in Riverside, California, seized by Riverside County Sheriff's Department in Jurupa Valley on September 8, 2023 ("SUBJECT DEVICE 7");

h.    A silver Western Digital hard drive bearing Riverside Sheriff's Department evidence barcode number 2606566, located in Riverside, California, seized by Riverside County Sheriff's Department on October 12, 2023 ("SUBJECT DEVICE 10");

i.    A silver HP laptop computer bearing Riverside County Sheriff's Department evidence barcode number 2606561, located in Riverside, California, seized by Riverside County Sheriff's Department on October 12, 2023 ("SUBJECT DEVICE 11").

5.    This affidavit is also made in support of an application for a warrant to search the following digital devices (collectively, along with the devices listed in paragraphs 4 and 6, the "SUBJECT DEVICES"), in the custody of Riverside Sheriff's Office, located in Ontario, California, at the Regional Computer Forensics Laboratory, as described more fully in Attachment A-3:

a.    A black tablet bearing Riverside County Sheriff's Department evidence barcode 2600638, located in Ontario, California, seized by Riverside County Sheriff's Department on September 14, 2023 ("SUBJECT DEVICE 8");

b.    A grey iPhone bearing Riverside County Sheriff's Department evidence barcode 2600639, located in Ontario,

California, seized by Riverside County Sheriff's Department on September 14, 2023 ("SUBJECT DEVICE 9");

c.    A blue Unihertz cellular phone bearing Riverside County Sheriff's Department evidence barcode number 2617176, located in Ontario, California, seized by the California Department of Corrections and Rehabilitation on October 12, 2023 at Solano State Prison ("SUBJECT DEVICE 15"); and

d.    A black One Cloud cellular phone bearing Riverside Sheriff's Department evidence barcode 2619093, located in Ontario, California, seized by Riverside County Sheriff's department on December 13, 2023 ("SUBJECT DEVICE 17").

6.    This affidavit is also made in support of an application for a warrant to search the following digital devices (collectively, along with the devices listed in paragraphs 4 and 5, the "SUBJECT DEVICES"), in the custody of Riverside County Sheriff Department's Office, in Jurupa Valley, California, as described more fully in Attachment A-4:

a.    The digital forensic download for a blue Motorola Cellular Phone bearing Riverside County Sheriff's Department evidence barcode 2607410, seized by Riverside County Sheriff's Department on October 12, 2023 ("SUBJECT DEVICE 12");

b.    A black ZTE cellular phone bearing Riverside County Sheriff's Department evidence barcode number 2606566, seized by the Riverside County Sheriff's Department on October 12, 2023 ("SUBJECT DEVICE 13");

c.    A blue Nokia Cellular Phone bearing Riverside County Sheriff's Department evidence barcode 2606572, seized By

Riverside County Sheriff's Department on October 12, 2023
("SUBJECT DEVICE 14"); and

      d.    A blue Samsung A10 Cellular Phone bearing
Riverside County Sheriff's Department evidence barcode number
2484119, located in Jurupa Valley, California, seized by the
California Department of Corrections and Rehabilitation ("CDCR")
at Solano State Prison on October 7, 2021 ("SUBJECT DEVICE 16").

    7.    The requested search warrants seek authorization to
seize evidence, fruits, or instrumentalities of violations of 18
U.S.C. §§ 1959(a)(1) (Violent Crime in Aid of Racketeering),
1201(a)(1), (c) (Kidnapping and Conspiracy to Kidnap);
924(c)(1)(A)(i), (ii) (Possess, Use, Carry, and Brandish a
Firearm in Furtherance of, and During and in Relation to, Crimes
of Violence); 1951(a) (Attempted Hobbs Act Extortion and
Conspiracy to Commit Hobbs Act Extortion); 1955 (Managing an
Illegal Gambling Business); 2(a) (Aiding and Abetting); and 3
(Accessory After the Fact) (the "Subject Offenses"), as
described more fully in Attachments B-1 and B-2.  Attachments A-
1, A-2, A-3, A-4, B-1, and B-2 are incorporated herein by
reference.

    8.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint, arrest
warrants, and search warrants, and does not purport to set forth
all my knowledge of or investigation into this matter.  Unless

specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

## II. BACKGROUND OF AFFIANT

9.    I am an investigative or law enforcement officer of
the United States and am empowered by law to conduct
investigations of and to make arrests for offenses enumerated in
Titles 18 and 21.

10.    I am a Special Agent ("SA") with the Federal Bureau of
Investigation ("FBI"), and have been so employed since January
of 2018.  I am currently assigned to the Riverside Resident
Agency, in Riverside, California.

11.    Upon joining the FBI, I attended and graduated from
the FBI Basic Special Agent Training Course in Quantico,
Virginia where I received training in a variety of investigative
and legal matters, including the topics of Fourth Amendment
searches, the drafting of search warrant affidavits, and
probable cause.  In my current role, I am assigned to a violent
crime criminal squad where I have experience conducting and
assisting with multiple gang and narcotics trafficking
investigations.  I have formal training in case management,
evidence collection, and handling confidential sources.  In
addition to formal classroom training, I have also completed an
18-month field training program under the direction of a senior
agent and have spent numerous hours working with senior agents
conducting a wide range of complex federal investigations.

12.  As an FBI SA, I have gained first-hand knowledge of criminal street gangs and narcotics trafficking investigations. I also learned about illegal narcotics trafficking operations from experienced FBI agents.  I have participated in several static and mobile surveillance activities across the Los Angeles and Inland Empire areas and assisted in the execution of multiple arrest and search warrants.  I have interviewed multiple confidential sources about narcotics trafficking.

13.  My colleagues and I have been investigating Westside Riva ("WSR") and Eastside Riva ("ESR") for over two years.  ESR is a closely associated Riva subset with many common associates to WSR.  The FBI began investigating WSR during a drug investigation where FBI agents conducted several controlled purchases from WSR and ESR drug dealers.  Since then, the investigation expanded to include a broader investigation of the enterprise as outlined below.  During the WSR and ESR investigation, I have participated in approximately a dozen gang search warrants, developed multiple Confidential Informants ("CIs") that were either WSR members or associates, and participated in multiple field interviews of WSR members and associates.  As part of my investigation, I have also worked with law enforcement officers who have been investigating WSR and ESR for more than 15 years and I have learned the history, structure, and many of the criminal schemes the gang conducts.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

14.  WSR is a gang operating in Riverside.  On September 7 and 8, 2023, WSR gang members tried to extort a local gas

station owner.  On September 7, 2023, RUBALCABA and another WSR gang member went to the gas station within Riverside, spoke to the owner of the gas station, and told the gas station owner he needed to pay taxes to "Westside Riva."  The owner of the gas station was confused and told them to leave.  RUBALCABA told the owner he would be back and the owner would have to speak with his boss.  The next day, RUBALCABA came back to the gas station, speaking on the phone to his boss, referring to RAMIREZ, and handed the phone to a gas station employee and reiterated that the gas station owner needed to pay taxes to WSR.  Responding to a call for service at the gas station, deputies arrived and arrested RUBALCABA for extortion.

15.  As part of that investigation, deputies conducted a traffic stop on September 8 of a car that they believed was part the extortion plot because a car that matched the car's description was used during the September 7, 2023 extortion attempt.  Deputies stopped the car and detained the vehicle occupants.  During that stop, a deputy seized about $7,247 from Person 1's purse, which the deputy believed was the proceeds of WSR extortion efforts.[1]  Over the next few weeks, RAMIREZ, who is currently in State Prison and who gives direction to WSR gang members, directed his WSR street enforcers RUBALCABA and MARTINEZ to abuse Person 1 in various way to punish her and to try to compel her to convince law enforcement to return the $7,247 that was seized from her purse.

---

[1] Person 1 does not have any prior criminal convictions.

16.    On or about September 27, 2023, RUBALCABA and MARTINEZ locked Person 1 inside the bathroom at RUBIDOUX FASHION, a WSR-controlled location that had a clothing store front, but was used as an illegal gambling establishment, or "casita," and a place WSR intended to use for prostitution and to film content for a WSR-sponsored Only Fans account.[2]  After being locked up for about four days with limited food or water, Person 1 escaped with the help of Witness 3, a bystander who heard Person 1 yelling for help and felt compelled to render aid despite knowing the location was under the control of a dangerous gang. During a video-recorded *Mirandized* interview, RUBALCABA admitted that RAMIREZ ordered him to strip Person 1 down, tie her up, and hold her hostage, but RUBALCABA also said he did not tie her up like RAMIREZ ordered, which allowed Person 1 to escape.

17.    The case is currently charged by the Riverside District Attorney's office.  Before a state court proceeding, RETAMOZA, a WSR associate, came to court and sat next to his mother.  RETAMOZA approached Person 1 and said words to the effect of "you better drop the fucking charges" and "don't be stupid."  An attorney who was sitting nearby, stood up, and placed himself between Person 1 and RETAMOZA, and gestured for RETAMOZA to walk away.  This encounter was captured on the court's video surveillance footage.

---

[2] Only Fans is an internet content subscription service used primarily to produce pornography.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

18.  Based on my review of law enforcement reports,
conversations with other law enforcement agents, and my own
knowledge of this investigation, I believe the following:

**A.  WSR is a Criminal Enterprise**

19.  WSR, including its leaders, members, and associates,
constitutes an enterprise as defined in 18 U.S.C. § 1959(b)(2),
that is, a group of individuals associated in fact that is
engaged in, and the activities of which affect, interstate and
foreign commerce.  WSR, through its members and associates,
engaged in racketeering activity, as set forth in 18 U.S.C.
§§ 1959(b)(1), 1961(1), that is, acts involving murder and
attempted murder, in violation of California law, offenses
involving extortion in violation of 18 U.S.C. § 1951(a), and
offenses involving trafficking in controlled substances, in
violation of 21 U.S.C. §§ 846, 841.

20.  WSR is a multi-generational gang founded in Jurupa
Valley, California.  WSR began in the late 1950s and early 1960s
as the Latin Souls.  In the late 1960s, the gang formed the
Banditos and Malditos cliques and the Latin Souls became
inactive.  By the 1970s, the only clique left was the Banditos
until the early 1980s when the gang started the Demonios clique.
The Banditos and Demonios cliques remained throughout the years
and additional cliques known as the Los Lobos and Blue Devils
eventually emerged.  These four cliques are what presently make
up WSR.  WSR is primarily involved in street robberies, drug
sales, and fighting with rival gang members in "turf battles."

Through the years, the gang dramatically increased its membership by absorbing smaller, less powerful local gangs.

21.  WSR is primarily a Latino, or Sureño, street gang. Members of WSR commonly use the abbreviation "WSR13" and "WSR" in the use of graffiti and tattoos.  Other names, signs, and symbols used by the gang are: "WS Riva," "Riva," "Rubidoux," the Riverside Raincross symbol (co-opting the Raincross symbol used throughout Riverside architecture, street signs, lighting standards, and used in the Riverside City flag), "West Side Riverside," "West Side," the letters "I E" or words "Insane Empire," and "West Side Rubidoux."  West Side Riva will also use the subsets or cliques' names including "Los Lobos," "Los Demonios," "Blue Devils," and "Malvados" in graffiti, tattoos, and drawings.  The use of the number 13 reflects WSR's allegiance to the Mexican Mafia prison gang.

22.  WSR gang members are involved with various violent crimes including acts involving murder, assault, robbery, and extortion, as well as narcotics trafficking, burglary, vehicle theft, illegal gambling activities, human smuggling, and money laundering.  Associates of the WSR gang are aware of, participate in, and benefit from these criminal activities.

23.   WSR's boundaries have historically been Highway 60 to the north and east, the Santa Ana River to the south and east, and Pedley Road to the west.   The eastern border is shared with ESR, a closely associated criminal street gang with many common associates to WSR.   A map that outlines WSR boundaries in red is included below:



24.   WSR is controlled by members and associates of the "Mexican Mafia," or "La Eme."   The Mexican Mafia is an organized group of individuals who control much of the drug distribution and other criminal activities within California State Prisons, local county jails, and some federal prisons.   Members and associates of the Mexican Mafia come from the ranks of local street gangs, like WSR.   In return for allowing local street gangs to maintain control over their respective territories and for protecting the gangs' members and associates during periods

of incarceration, the Mexican Mafia requires the gangs to collect and pay "taxes" on drug trafficking and other illicit and illegal conduct taking place in those territories.  These illicit funds are intended to be controlled by, and are often held in trust by, gang members and associates for the Mexican Mafia members in charge of a particular area.  Members and associates of WSR regularly collects and pays extortionate taxes to Mexican Mafia members and Mexican Mafia associates who oversee the gang.  The primary task of WSR leadership on the streets is to collect extortionate taxes from drug dealers, gambling establishments, smoke shops and other illicit or near-illicit business operating within WSR's territory and to punish individuals who fail to pay the requisite extortionate taxes.

**B.    RAMIREZ, RUBALCABA, and MARTINEZ are Members of WSR**

25.  Based on my training and experience, conversations with other law enforcement officers and agents, my familiarity and personal involvement with this investigation, and my review of social media photographs, booking photographs, and photographs provided by the California Department of Corrections, I am aware of the following:

a.    RAMIREZ is a Mexican Mafia associate, and he controls WSR operations.  RAMIREZ has multiple tattoos showing his membership in WSR and his moniker of "Lil Man."  RAMIREZ has a tattoo of "WS" on his chest, which represents "Westside." RAMIREZ has a tattoo of "RIVA" on his abdomen along with the letters "WSR" on his forearm.  In addition, RAMIREZ has tattoos on his legs with the word "lil" on his right leg and the word

"Man" on his left leg showing his moniker of "Lil Man."  RAMIREZ
has been in prison since 1995 after being convicted of three
counts of murder stemming from a shooting in WSR-controlled
territory.  CDCR investigators report that during his time at
Solano State Prison, RAMIREZ became close to Mexican Mafia
member Braulio "Babo" Castellanos, who is now deceased, and
achieved "associate" status in the Mexican Mafia.  On September
14, 2023, while searching a vehicle during a WSR extortion
investigation, Riverside Sheriff's Office deputies found a
framed picture of RAMIREZ and Castellanos together wearing their
blue inmate uniforms.

b.    RUBALCABA is a WSR member.  At the time of his
arrest in this case, he was RAMIREZ's primary tax collector and
enforcer.  During a video-recorded, *Mirandized* interview on
October 12, 2023, RUBALCABA said he had been with WSR for "a
couple years," but would not say which clique he was with,
saying, "I'd rather not say."  I have viewed a picture that was
captured on social media showing RUBALCABA with a senior WSR
gang member.[3]  In the picture, RUBALCABA is creating a "W" to
signify WSR.

c.    MARTINEZ is a WSR member.  MARTINEZ has a "WS"
tattoo on his neck, which stands for WSR.  MARTINEZ also has a
tattoo on his chest of "RBDX," which stands for Rubidoux and
refers to WSR-claimed territory.

---

[3] The senior gang member in this picture is under
investigation for conspiring with other WSR gang members to
smuggle drugs into the Riverside County Jail.

### C.    RUBALCABA and WSR Gang Members Attempt to Extort Gas Station on September 7 & 8, 2023

26.    On September 8, 2023, Deputy Edgar Aubert of the Riverside County Sheriff's Department responded to a gas station in Jurupa Valley in Riverside County after the gas station owner reported that his business was being extorted.  An employee reported to the owner that there were three gangsters inside the gas station store who were trying to collect "taxes."  Deputies arrived and detained RUBALCABA and another WSR gang member, A.G.[4]

27.    Another officer, Corporal Smith, spoke with the owner on the phone after RUBALCABA and A.G. were detained.  The owner reported that suspects were in the store the previous day, on September 7, 2023, and said that they needed to talk to the "boss" of the gas station about "online gambling."  On September 7, the owner was not at the gas station, but he was monitoring a live surveillance feed from the gas station and saw two suspects, one of whom was RUBALCABA, speaking with his cashier.[5] Deputies identified the second person with RUBALCABA on

---

[4] According to RSO Gang Report in case file GR2780001, A.G is WSR gang member. I have read the report and spoke with RSO gang deputy Cesar Martinez who wrote the report. The report documents A.G.'s multiple WSR tattoos such as "Rubidoux" on his neck which is one of the main neighborhood's WSR controls and a "WS" tattoo on his hand which stands for West Side Riva. In addition, the report documents multiple social media posts depicting photos of A.G. flashing WSR gang signs, such as a "W," while brandishing guns.  The report also documents multiple social media posts with A.G. and numerous other documented WSR gang members flashing WSR gang signs and standing in front of WSR graffiti.

[5] Investigators know the name and other identifying information of this cashier, but the cashier's true name is omitted from this affidavit to protect the cashier's identity.

September 7, 2023 as WSR gang member, X.B.[6]  The video
surveillance from the inside of the gas station shows RUBALCABA
talking with the cashier and captures him telling the cashier
that he had a message she would need to "relay" to the boss.
The owner called the store and asked the cashier what was
happening.  The cashier told the owner, "he wants to talk to
you."  The cashier then handed the phone to RUBALCABA.

    28.  RUBALCABA walked away from the camera and spoke with
the owner on the phone.  The owner said that RUBALCABA told him
that he needed to pay taxes for protection.  RUBALCABA said that
he was from the local gang, "Westside Riva," and that they owed
taxes.  RUBALCABA said the gas station was doing online gaming
so they needed to pay WSR.  The owner replied that people do not
play the games much and he said he was not going to pay.
RUBALCABA said that WSR controlled the surrounding areas and
they collected taxes.  The owner repeated that he does not pay
taxes.  RUBALCABA said he would return to the gas station so the
owner could speak with his boss.  The video then shows RUBALCABA
hand the phone back to the cashier and walk out of the gas

---

[6] According to RSO Gang Report in case file GR2780001, X.B
WSR gang member. I have read the report and spoke with RSO gang
deputy Cesar Martinez who wrote the report. The gang report
references a previous RSO police report documenting that X.B.
sent threats of violence via text message. In this report, X.B
claimed membership in WSR. X.B. wrote, "Foo u don't want to find
out who I am" and "Nigga WSR Los Damnous . . . Wadsup nigga…
It's all about gangs I will have a 45 on u." He also sent photos
of gang members displaying gang signs with their hands.  During
this encounter, the deputy asked X.B. what WSR and Los Damnous
meant to which X.B. replied "Westside Riva".  Based on my
experience investigating WSR, I believe that when X.B. claimed
he was from "Los Damnous" in a text message, that was a typo and
X.B. meant to claim "Los Demonios," which is a clique or subset
within WSR.

station store.  RUBALCABA and X.B. then left the gas station and
were captured on video leaving the scene in a black Cadillac
CTS.  The clerk then left the owner a voice message and said,
"it's Westside Riva, I can't be involved."

29.  The next day, on September 8, 2023, at about 6:46
p.m., the same cashier was working again when exterior
surveillance footage showed a black Honda accord arrived at the
gas station.  The cashier sent the owner a voice message at
about 6:46 p.m. saying, "there's three guys hanging out at the
front, look at the camera please."  Next, she sent a voice
message at about 6:46 p.m. that said, "they're coming in," and
then moments later, she sent another message saying, "They're
back."  At about 6:48 p.m., the cashier sent a text message
asking the owner to call 911 and the owner did call 911.  In the
video, I have viewed, I can see that RUBALCABA entered the store
of the gas station with A.G.  The third person the cashier saw
did not enter the store of the gas station.  When RUBALCABA came
into the gas station store, I can see from the video he was
talking on a cellphone.  RUBALCABA waited for other customers to
leave, and then the video shows that RUBALCABA handed the
cellphone he was holding to the cashier.  The gas station
surveillance video captures RUBALCABA say to the cashier, "I got
my boss right here on the line, he's pretty upset" and "he wants
to talk to your boss."  The cashier appears startled and said,
"I don't want to be involved."  The gas station surveillance
video captures RUBALCABA say something to the effect of, "you
are just going to talk to the boss."

30.   RUBALCABA then held his cellphone close to the cashier.  The surveillance video audio does not capture what was said on the phone to the cashier, but the cashier responds by saying something to the effect of, "I am not saying . . . I know it's there."  RUBALCABA then said, "he was denying it on the phone" and "he was trying to be stupid with us."  RUBALCABA said, "why did you want to play stupid?"  The cashier continued listening to the cellphone.

31.   A Riverside County Sheriff's Office deputy then walked into the gas station store and RUBALCABA told the cashier he would like to buy some cigarettes.  The deputy asked RUBALCABA and A.G. to step aside and then the deputy detained and arrested them.[7]  I have reviewed body-worn camera footage from this encounter and I can see that, during the arrest of RUBALCABA and A.G., deputies stated SUBJECT DEVICE 1 was seized from RUBALCABA and SUBJECT DEVICE 2 was seized from A.G.[8]  Also, Person 1 told me that RUBALCABA's phone had a cracked screen and I could see from reviewing the body-worn camera footage that SUBJECT DEVICE 1 had a cracked screen.  Accordingly, I believe SUBJECT DEVICE 1 was the phone used by RUBALCABA to call RAMIREZ during the attempted extortion on September 8, 2023.

---

[7] J.C. and R.M. were present outside the Gas N Go and appeared to have arrived with RUBALCABA and A.G. They both stayed outside of the gas station while RUBALCABA and A.G. went inside. When RSO deputies arrived at the gas station, J.C. and R.M were interviewed and then released.

[8] During the events after the arrest SUBJECT DEVICE 1 and SUBJECT DEVICE 2 were placed together in an evidence bag and mistakenly attributed to J.C. when they were booked into RSO evidence.

32.   One of the deputies interviewed the store clerk who said, "You know what, I'm done talking," "I am not going to give you my name," and "I am scared for me and my family."  "These guys are local gangsters and I don't want them to hurt us."

33.   A few days later, the cashier sent the owner a voice message that said another business in the area was also being extorted.  The cashier also said that the leader's name was "Lil Man."

**D.   Investigators Conduct Traffic Stop on Black Cadillac CTS and Seize $7,247**

34.   At about 10:28 p.m. on September 8, Corporal Smith, one of the deputies who investigated the gas station extortion attempts, saw a black Cadillac CTS, the same type of car that was used by RUBALCABA during the September 7 extortion attempt, and conducted a traffic stop on the Cadillac.  Corporal Smith recognized the driver of the Cadillac as X.B., the second person from the surveillance video of the attempted extortion on September 7, 2023.  Corporal Smith saw another adult in the passenger seat, J.C.[9], and Person 1 and Person 1's minor child

---

[9] According to RSO Gang Report in case file GR2780001, J.C. is a WSR gang member. I have read the report and spoke with RSO gang deputy Cesar Martinez who wrote the report. The report documents J.C.'s multiple gang tattoos such as "Rubidoux" across his back which is one of the main neighborhoods that WSR controls. He also as a tattoo the Saint Louis Cardinals emblem or "STL" and a 23 across his forearm.  The "STL" tattoo stands for "Locotes" or the "crazies" and a 23 represents the 23rd letter in the alphabet, or "W," for WSR.  He also has a tattoo reading "RIP Blue" referencing the murder of Aimga Magallanes, another WSR member, who was killed on October 9, 2021. In addition, the report documents multiple social media posts depicting photos of J.C. flashing WSR gang signs, such as a "W". Lastly, the report also documents multiple social media posts with J.C. and numerous other documented WSR gang members flashing WSR gang signs and standing in front of WSR graffiti.

were in the back seats of the two-row vehicle.  Corporal Smith
detained all four people.  Person 1 then asked Corporal Smith if
she could get her bag out of the Cadillac.  Corporal Smith
offered to retrieve the bag for her so long as he could inspect
it for his safety, and Person 1 agreed.  Corporal Smith
retrieved the bag, and inside the bag, he found $7,247.  Based
on Corporal Smith's investigation, including recognizing X.B.
from surveillance footage at the gas station of September 7,
2023, he believed this money was extortion payments that had
been collected by WSR gang members.  He seized the money and
then arrested all three adults, including Person 1, and
transported them to the local sheriff's station for processing.

35.  On September 8, 2023, Riverside County Sheriff's
Department Corporal Joseph Smith seized SUBJECT DEVICE 3,
SUBJECT DEVICE 4, SUBJECT DEVICE 5, SUBJECT DEVICE 6, and
SUBJECT DEVICE 7, incident to the arrest of J.C., who was a
passenger in the Cadillac CTS.  The arresting officer recalls
that SUBJECT DEVICE 3 through SUBJECT DEIVCE 7 were located in
various pockets on J.C.'s person and the arresting officer noted
in his inventory of seized property that SUBJECT DEVICE 3
through SUBJECT DEIVCE 7 each belonged to J.C. because they were
found in his pockets.

36.  After the black Cadillac was stopped on September 8,
2023, it was towed, where it was not accessible to anyone other
than law enforcement.  On September 14, 2023, deputies executed
a state search warrant for the black Cadillac and found SUBJECT
DEVICE 8 and SUBJECT DEVICE 9.  SUBJECT DEVICE 8 was in the

backseat next to a framed picture of RAMIREZ and Mexican Mafia member Braulio "Babo" Castellanos. SUBJECT DEVICE 9 was in a cup holder of the front center console. Person 1 also stated that she saw RUBALCABA and J.C. using a tablet matching SUBJECT DEVICE 8 to access security cameras, gambling accounts, and CashApp accounts.  Person 1 stated she also saw RUBALCABA and J.C. using a smart phone, which she described as an "Obama phone" with a cracked screen, which based on my experience and observations, I believe is a phone SUBJECT DEVICE 6 to access security cameras, gambling accounts, and CashApp accounts.[10]

37.  During an interview at the local sheriff's station, Person 1 said that she operated a small business in the area and was also forced to make extortion payments to WSR tax collectors.  Person 1 also agreed to work with law enforcement to make a controlled extortion payment to these WSR tax collectors, but those efforts failed and Person 1 was subjected to greater scrutiny after RAMIREZ held her responsible for losing $7,247 during the September 8, 2023 encounter.

---

[10] Based on my experience, I understand that when Person 1 refers to an "Obama phone," she is referring to a cellphone that the government provides under the United States Lifeline Program for low-income consumers.  I understand that only certain types of cell phones are provided through the Lifeline Program.  Thus, some people refer to certain brands or model phones as "Obama" phones.

**E.    At the Direction of RAMIREZ, RUBALCABA and MARTINEZ Lock Person 1 in the Bathroom of RUBIDOUX FASHION for Days**

1.    RUBALCABA and MARTINEZ Monitor Person 1 and Subject Her to Intermittent Confinement Leading Up to September 29, 2023

38.    Person 1 reported that after the September 8, 2023 arrest, RAMIREZ held her responsible for losing $7,247 and put her under strict supervision, to include periods of confinement, and made her run additional errands with WSR gang members. Person 1 reported that after September 8, 2023 and leading up to the kidnapping event described below, the person Person 1 identified as "Demon," (who she later identified as RUBALCABA during a photo line-up procedure) and the person Person 1 identified as "Bam Bam" (who she later identified as MARTINEZ during a photo line-up procedure) would pick her up from where she was living and would take her to her store where she worked. At various points between September 8, 2023 and September 27, 2023, RUBALCABA and MARTINEZ would put Person 1 in the bathroom of the store where Person 1 worked and blocked the bathroom door with cabinets to keep her from getting out.  Person 1 also reported that she was forced to run errands for RUBALCABA and MARTINEZ to help with other WSR business ventures.  During this time, Person 1 explained she saw that RUBALCABA and MARTINEZ were in constant contact with RAMIREZ via cellular telephone, and Person 1 heard RAMIREZ tell RUBALCABA and MARTINEZ to make Person 1 get the $7,247 that was seized back from Riverside County Sheriff's Department.

39.  At one point, on or about Friday September 22, 2023,
RAMIREZ spoke to RUBALCABA on speaker phone in Person 1's
presence and Person 1 heard RAMIREZ tell RUBALCABA, "That bitch
better get my money," "What are you doing to get my money back"
and "What have you done, are you pushing the issue?"  RAMIREZ
told Person 1 to make an appointment with an attorney to see if
she can get the money back.  Person 1 called a law firm located
in the City of Riverside and scheduled an appointment for
Monday, September 25, 2023, at 2:30 p.m.  On that date and time,
the attorney told Person 1 and RUBALCABA, who was also present
for the meeting, that Person 1 could not get the $7,247 back
until the extortion case that the state had charged was
resolved.

        2.    RAMIREZ Orders RUBALCABA to Strip Person 1 and
              Lock Her Inside RUBIDOUX FASHION

40.  On or about September 27, 2023, Person 1 reports that
RUBALCABA picked her up from where she was staying and took her
to run some errands.  One errand was a trip to Walmart to buy
air mattresses and towels.  RAMIREZ and RUBALCABA planned to use
the air mattresses and towels as props for an Only Fans account
that they intended set up and then intended to make Person 1
create content for the account for the financial benefit of
RAMIREZ.

41.  After that errand, RUBALCABA took Person 1 to RUBIDOUX
FASHION located at 5582 Mission Boulevard in Riverside.
RUBIDOUX FASHION has a clothing store front, but the back of the
store, which might have been designed to be a back room for

storing inventory for a legitimate business, was a place used by WSR gang members and associates to congregate. That space included sofas, banners and posters, an image honoring Mexican Mafia member Braulio "Babo" Castellanos, and also served as a "casita" where WSR associates could come to play the "fish games," which are electronic gambling games. Person 1 reports that RAMIREZ also intended to use that space to film content for the Only Fans account and to manage a prostitution operation.

42. On or about September 27, 2023, according to Person 1, Person 1 was at RUBIDOUX FASHION with RUBALCABA and MARTINEZ after coming from Walmart with the props to set up the Only Fans studio when, Witness 1, a person who liked to play the "fish games," came in and asked if the "casita" was open. Either RUBALCABA or MARTINEZ told Witness 1 they were closed, and Witness 1 started to leave. Person 1 asked Witness 1 to wait for her because she wanted to walk home with Witness 1. After Person 1 started walking with Witness 1, RUBALCABA followed Person 1 and told her to get back inside RUBIDOUX FASHION.[11] Person 1 complied, and as she returned to RUBIDOUX FASHION, RUBALCABA called RAMIREZ and placed the call on speaker phone. During that call, RAMIREZ told RUBALCABA and MARTINEZ to "strip her down, take her shit, and lock her up."[12] RUBALCABA did not

---

[11] I interviewed Witness 1 who remembered this encounter, remembered leaving with Person 1, and then remembered RUBALCABA coming after Person 1 and say to her words to the effect of, "Where the fuck are you going, get back here." Witness 1 remembers Person 1 complied with RUBALCABA's demand and started walking back to RUBIDOUX FASHION.

[12] As detailed further below, during a *Mirandized* interview, RUBALBACA admitted that he received this order from RAMIREZ.

strip Person 1 of all her clothing, but he did take her personal belongings and made her go into the bathroom at RUBIDOUX FASHION.  Person 1 protested and said she had not done anything wrong, and she would not go into the bathroom.  MARTINEZ then hit Person 1 in the midsection and pushed her into the bathroom. MARTINEZ and RUBALCABA then locked the bathroom door behind Person 1.  Person 1 said the doors to the bathroom at RUBIDOUX FASHION could be locked from the outside so that she could not get out.

43.  For the next several days, from September 27 to October 1, RUBALCABA and MARTINEZ would return to RUBIDOUX FASHION each day.  At various points when they returned, they unlocked the bathroom door and allowed Person 1 to move about the inside of Rubidoux Fashion.  Person 1 stated that RUBALCABA carried a black and gray handgun and she described where he sometimes kept the gun when he was at RUBIDOUX FASHION.  She said it was small, possibly a .38 caliber firearm, that was not a revolver.[13]  During the investigation, I reviewed social media images and discovered a photograph of RUBALCABA standing inside a "casita" with a small black and gray handgun in his waistband.

44.  On one of those days when RUBALCABA and MARTINEZ allowed Person 1 out of the bathroom, Person 1 ate some candy that she found and also drank a beer that was inside a fridge. Other than that beer and candy, and the running water in the bathroom, Person 1 did not have access to food or water between

---

[13] As discussed below, officers found a compact, black and silver Glock firearm inside RUBIDOUX FASHION when they executed a search warrant there on October 12, 2024.

September 27 and October 1.  On another day during the period of
confinement when Person 1 was inside RUBIDOUX FASHION, Witness 2
came to RUBIDOUX FASHION to try to give Person 1 something to
eat, but he could not get inside and left.[14]

45.  RUBALCABA and MARTINEZ returned to the store on the
morning of Sunday, October 1, and RUBALCABA told Person 1 he was
told to assault her.  Person 1 began crying and told RUBALCABA
not to hit her.  MARTINEZ then stated, "I'm going to ask the big
homie for permission that when someone sees you out there for
them to stomp on you."  MARTINEZ was trying to hit Person 1, but
RUBALCABA told him to walk away.  RUBALCABA told Person 1 to
stop crying and he was not going to hit her.  He then told her
he was going to leave the door unlocked once he left.  Person 1
was crying and walked inside the bathroom, laid down on the
floor, and she fell asleep.  Once she woke up, Person 1 tried to
open the bathroom door and found it was unlocked.  She walked
out of the bathroom and noticed that a camera had been propped
up in the hallway.  The camera also has a speaker enabled and
she heard RAMIREZ's voice giving her commands and telling her to

---

[14] Investigators interviewed Witness 2 who confirmed he went
to RUBIDOUX FASHION to try to bring Person 1 something to eat,
but he could not get inside RUBIDOUX FASHION so he left.
Witness 2 did not report the kidnapping to the police because he
knows what the perpetrators of the kidnapping are capable of.
Witness 2 also stated that RUBALCABA came to his mechanic shop
and taxed him, and during a period when Witness 2 could not pay
the extortionate taxes because he was hospitalized, he came back
to his mechanic shop and discovered some of his things had been
stolen.  During an interview, Person 1 said that she worked with
Witness 2 for a time and knew Witness 2 was a methamphetamine
dealer.  Person 1 stated WSR was taxing Witness 2 based on his
methamphetamine sales.

go back into the bathroom.[15]  Person 1 ignored RAMIREZ's commands and began walking around RUBIDOUX FASHION looking for a way out.

### 3. Witness 3 Helps Person 1 Escape from RUBIDOUX FASHION

46.  Person 1 stated as she moved about RUBIDOUX FASHION looking for a way out, she believed the camera was moving towards her and following her.[16]  Eventually, Person 1 found a side door that had been painted to look like a wall and found that door was unlocked.  That door opened into an outdoor fenced area behind RUBIDOUX FASHION.  In the outdoor gated area, Person 1 tried jumping the fence, but it was too tall and she began yelling for help.  A bystander, Witness 3, heard her, approached her, and agreed to help her.  Both Person 1 and Witness 3 explained that Person 1 could not climb the fence because it was very tall.  Person 1 also said she was not feeling well, and Witness 3 noticed she appeared very animated and frightened.  Witness 3 then grabbed a used tire from nearby and threw it over the fence.  Person 1 used the tire to stand on and managed to get on the top of the chain link fence.  With Person 1 standing

---

[15] As detailed further below, during a prior investigation involving RAMIREZ, law enforcement officials searched RAMIREZ's prison cell and recovered a contraband cellphone.  Investigators in that case searched the contraband cellphone pursuant to a state warrant and found images and videos of the interior of RUBIDOUX FASHION.

[16] When law enforcement executed the search warrant at RUBIDOUX FASHION on October 12, 2023, they knocked down several security cameras staged throughout RUBIDOUX FASHION.  I believe that officers knocked the cameras down so for safety reasons so they would not be monitored while executing the warrants.  It is possible a camera was mounted to a device that moved throughout RUBIDOUX FASHION.  It is also possible that Person 1 heard RAMIREZ's voice through the various security cameras that were staged throughout RUBIDOUX FASHION.

on the tire, Witness 3 and a second person, were able to pull
Person 1 over the fence.[17]  Once she made it over the fence,
Person 1 borrowed Witness 3's cellphone and called for help.

        4.   <u>Person 1 Recounts Details of Kidnapping and
History of Exploitation</u>

    47.  Person 1 called law enforcement while she was
receiving treatment at a local hospital.  On October 5, 2023, a
law enforcement officer responded to the hospital to interview
Person 1.  Person 1 described the events of her kidnapping in
detail in that interview and in subsequent interviews with
investigators.

    48.  During the initial meeting in the hospital on October
5, 2023, Person 1 said she sees RUBALCABA carry a gun all the
time and sometimes he points it at her when he is telling her
what to do.  She described the gun as black and gray handgun.
She said it was small, possibly a .38 caliber firearm, but it
was not a revolver.  She believes RUBALCABA stole the gun from
Witness 2.

    49.  Person 1 stated she met RUBALCABA and MARTINEZ a few
months earlier when she first started as a player in the illegal
gambling games that WSR managed from "casitas."  After first
meeting the WSR gang members, WSR gang members approached her
about going into business with them and told her that they would
protect her.  Person 1 refused and began working at a bar in
Riverside instead.  Person 1 said that after she refused to work
with WSR, one night a woman walked into the bar and assaulted

---

    [17] This second person is a homeless noncitizen that
investigators have not yet located.

her, leaving her with significant injuries.  A few minutes later
RUBALCABA, walked into the bar and asked her, "You want
protection now?"  Person 1 said she was also assaulted in front
of a Smoke Shop in Jurupa Valley.  Person 1 said that after she
was beat up twice, RAMIREZ told her a lot of people don't like
her in the street and she would continue to get beat until she
reached out to WSR for help.

50.  Person 1 agreed to work with WSR and WSR began
exploiting her.  At various times, RAMIREZ made Person 1 appear
on camera and display her genitals for RAMIREZ.  RAMIREZ told
Person 1 that if she did not do what he asked, she would end up
in the "back of a trunk."  RAMIREZ also made Person 1 take a
photo with RUBALCABA and post it on a swinger's application to
seem like they were swingers.  In late September 2023, RAMIREZ
had planned on using RUBIDOUX FASHION for prostitution and to
film content for a WSR-sponsored Only Fans account.

51.  Person 1 also said that when she began operating her
small business in the area, she was forced to make extortion
payments to WSR tax collectors.  At first, she paid $500 at the
beginning of each month and then her payment was reduced to $300
per month.

52.  In a subsequent meeting, a different deputy conducted
a photo line-up procedure with Person 1 so she could attempt to
identify the people who kidnapped her.  During the photo line-up
procedure, Person 1 was shown photo lineups and identified (1)
"Demon" as one of her kidnappers, (2) "Bams" or "Bam Bam" as
another one her kidnappers, and (3) "Lil Man" as the person who

directed the kidnapping.  Law enforcement knows those photos to
be of RUBALCABA, MARTINEZ, and RAMIREZ, respectively.

    53.  Person 1 was familiar with RAMIREZ's appearance
because she had seen him multiple times on video chats.  She
also recognized RAMIREZ's appearance from the framed picture of
RAMIREZ that was seized by Riverside Sheriff's deputies on
September 8, 2023 as the same person she knew as RAMIREZ from
video chats.

            5.  Review of Person 1's Medical Records

    54.  During a review of Person 1's medical records, I
noticed that on October 5, 2023, Person 1 reported to medical
providers that she had three or more consecutive dates of poor
oral intake prior to admission, meaning that she had not eaten
or eaten very little for at least three days prior to seeking
medical treatment.  I also saw photographs taken while Person 1
was hospitalized that show a dark bruise on Person 1's chest,
consistent with being hit.

    **F.  Execution of Search Warrant at RUBIDOUX FASHION,
        Seizure of SUBJECT DEVICES 10-14, Arrests of RUBALCABA
        and MARTINEZ, and Probable Cause to Believe Additional
        Evidence is Still Located within RUBIDOUX FASHION**

    55.  On October 12, 2023, investigators executed a state
search warrant at RUBIDOUX FASHION.  During the search,
investigators discovered several security cameras throughout the
inside of the store, but they did not seize them.  Investigators
found a black and gray Glock 43, 9mm semi-automatic handgun
bearing serial number BBZA355 and a magazine loaded with six
rounds of 9mm ammunition tucked in a couch in the main room.  In

a back room that contained lockers, officers found $3,249 in an envelope along with receipts in Person 1 and RUBALCABA's names. In the same room, officers saw SUBJECT DEVICE 10 on a table next to a Capital One credit card bearing RUBALCABA's name.  SUBJECT DEVICE 10 was marked with "WS RIVA" and had two lines and three dots above the two lines.[18]  Investigators also found four gambling machines in the main room.  Investigators also found SUBJECT DEVICE 11 inside RUBIDOUX FASHION.  Photographs from the search warrant execution show SUBJECT DEVICE 11 was found on what appears to be a massage table.[19]  Investigators found Person 1's purse, SUBJECT DEVICE 12, and her clothes in the main room.

56.  In a dirt parking lot south of RUBIDOUX FASHION, in a black Honda Civic registered to RUBALCABA, SA Greg Hafer found SUBJECT DEVICE 13.

57.  In a red Ford Explorer, parked inside of a fenced dirt parking lot south of RUBIDOUX FASHION, SA Hafer found SUBJECT DEVICE 14.

58.  While investigators searched RUBIDOUX FASHION, SA Thomas Lobach looked around the surrounding area and saw

---

[18] The two lines with three dots is a symbol for Mexican Mafia-affiliated gangs.  The lines are meant to represent the Aztec number for five and the dot is meant to represent the Aztec number for one.  The two lines and three dots add up to 13 and 13 represents the thirteenth letter in the alphabet of "M," which represents the "Mexican Mafia," or "La Eme."

[19] Based on my review of the photographs, I believe the photograph of SUBJECT DEVICE 12 on the massage table was taken before SUBJECT DEVICE 12 was moved or seized because it is a best practice for officers to take photographs of evidence in the location it is found before seizing evidence.

RUBALCABA in the front seat of a white PT Cruiser.  Officers
then arrested RUBALCABA.

59.  During the execution of the warrant, investigators
took photographs of various items, including security cameras
and what may be a security camera hub.  Those cameras and the
hub were not seized.  Investigators also did not take
photographs of the locks on the bathroom doors, which were used
to keep Person 1 locked inside the bathroom.[20]  I was present for
the execution of the search warrant and I remember the door to
the bathroom appeared to lock from the outside instead of
locking from the inside like a normal bathroom door.  I remember
the door had a deadbolt locking knob on the outside, meant the
deadbolt was locked and unlocked from the outside of the door.
I also noticed what appeared to be the black door Person 1
escaped to the fenced outside area of the casita.  The door was
painted black to blend in with the wall and located next to a
water heater and various other items that made it difficult to
notice. Investigators also did not capture a clear photograph of
the dark-colored door through which Person 1 escaped.

60.  Investigators have conducted regular surveillance of
Rubidoux Fashion beginning in January of 2024. During their
surveillance, investigators noted there were no obvious changes
with the location.  The storefront appeared closed, with no
pedestrian traffic entering or exiting the store.  The perimeter
security lighting was still operational, and sometime between

---

[20] The photographs that capture the bathroom doors are not
clear enough to show the locking mechanisms on the doors and the
deputies.

the execution of the search warrant and January of 2024, a blue
tarp had been placed over the chain link fence around the rear
yard of the building, which obstructed the view into the yard.
On March 26, 2024, investigators saw a vehicle parked in the
rear alley of RUBIDOUX FASHION, and the rear exterior security
door open, but they did not see anyone entering or exiting the
building.  On April 10, 2024, investigators conducted
surveillance at RUBIDOUX FASHION.  They did not see any
customers frequenting the business and the store front appeared
closed.  Investigators also noted the rear of the building
appeared unchanged from the previous warrant service on October
12, 2023.  Investigators queried commercial records databases
for persons associated with RUBIDOUX FASHION and located three
people and two addresses associated with the business name.  Of
the three people associated with the business name, a 21-year-
old woman named X.L. filed a Fictitious Business Name ("FBN")
record with Riverside County for RUBIDOUX FASHION.  In the FBN
record, X.L. is listed as the owner of RUBIDOUX FASHION.  On
October 15, 2021, X.L. was riding as a passenger in a black
Honda, with a license plate ending in 268, when the car was
stopped by RSO deputies shortly after the car departed from the
front of RUBIDOUX FASHION.  Another person, X.C., was the
driver, but during this encounter with RSO deputies, X.L. said
she was the owner of RUBIDOUX FASHION.

61.  RSO deputies recently arrested X.C. for his
involvement in a WSR related shooting that took place in March
of 2024.  After this arrest, RSO investigators served a search

warrant at X.C.'s residence.  Present at X.C.'s residence was
his relative T.L. who appeared to also live at the same
residence as X.C.  RSO Investigator Valenciano remembers from
her initial review of SUBJECT DEVICE 16 seized from RAMIREZ in
2021 (and discussed further below), that T.L. was in regular
contact with RAMIREZ and RAMIREZ had photos of RUBIDOUX FASHION
on SUBJECT DEVICE 16.

62.  Based on my training and experience with this and
other gang investigations, I believe that X.L. is acting as the
nominal owner of RUBIDOUX FASHION on behalf of RAMIREZ.  I
believe investigators will find further evidence of X.L.'s
connection to RAMIREZ as well as further evidence of RAMIREZ's
control and ownership of Rubidoux Fashion on SUBJECT DEVICE 16.

63.  I believe there is still evidence relating to the
SUBJECT OFFENSES within RUBIDOUX FASHION to include, but not
limited to, (1) images the bathroom doors and locks that were
used to keep Person 1 inside the bathroom while she was confined
in RUBIDOUX FASHION, (2) images the dark-colored side door that
Person 1 used to escape, (3) disabled security cameras, and
potentially, a security camera hub that may contain data, (4)
machines that were being used to as part of an illegal gambling
business in violation of 18 U.S.C. § 1955, (5) indicia of
affiliation with WSR, and (6) DNA and fingerprints of people who
were present within the building.

**G.  Seizure of SUBJECT DEVICE 15 from RAMIREZ's Prison Cell on October 12, 2023.**

64.  On or about October 12, 2023, at about the same time investigators were searching RUBIDOUX FASHION, corrections officers at the CDCR in Solano State Prison searched RAMIREZ's prison cell.  In the cell, an officer found SUBJECT DEVICE 15, a contraband cellphone.

**H.  Seizure of SUBJECT DEVICE 16 from RAMIREZ's Prison Cell on October 7, 2021 and Discovery of Images of Interior of RUBIDOUX FASHION**

65.  Two years earlier, on October 7, 2021, as part of a separate investigation involving RAMIREZ, CDCR seized SUBJECT DEVICE 16, a contraband cellphone, from RAMIREZ's cell at Solano State Prison.  Riverside County Sheriff's Office Deputy Valenciano, who has been investigating WSR for years, reviewed the contents of SUBJECT DEVICE 16, or forensic copies thereof, pursuant to a state search warrant and recalled seeing images of RUBIDOUX FASHION.  I seek authorization to search SUBJECT DEVICE 16 again.  I believe the data from SUBJECT DEVICE 16 will help reveal evidence of the SUBJECT OFFENSES because it will show RAMIREZ's history of monitoring RUBIDOUX FASHION.  The data from SUBJECT DEVICE 16 will be especially important in helping to establish RAMIREZ's identity as "Lil Man" and the person who was directing RUBALCABA, MARTINEZ, and other WSR gang members to commit the SUBJECT OFFENSES.

I.   **RUBALCABA Admits Extorting "Retards" Who Did Not "Get the Memo" and Being Ordered to Strip and Confine Person 1**

66.   During a video-recorded, *Mirandized* interview, RUBALCABA, said that he had been arrested because of "the extortion . . . Just a bunch of bullshit."

67.   RUBALCABA said "at the end of the day, we all sign up for some shit and sometimes you end up regretting it" and "you try to find a way out, but there is no way out."  RUBALCABA said he was relieved to be arrested because he was tired of being bossed around by RAMIREZ.  RUBALCABA said he had been part of WSR for "a couple years," but would not say which clique he was with.

68.   RUBALCABA said he "had to do stuff . . . because somebody don't get the fucking picture, or somebody didn't get the fucking memo" and "it's a bunch of fucking retards in this hood."  From watching the video of interview, I understood this statement to mean that RUBALCABA had to extort people and that people within WSR-controlled territory who don't understand they must pay "taxes" are "retards."

69.   Referring to RAMIREZ, RUBALCABA said he had to do what RAMIREZ ordered.  He said, "You guys probably heard some of the conversations that we've had and how much we argue because he's trying to bitch me around and threaten me."  He said, "That mother fucker is evil.  I'm just gonna tell you, I thought I was evil.  He's a lifer, they don't give a fuck about nobody, and I found out the hard way."  RUBALCABA said he was glad to be in a cell so he would not have to talk with "that mother fucker."

Deputy Martinez asked him if we are talking about "Lil Man" and RUBALCABA replied, "Of course." Deputy Martinez asked him if he also knows him as "Luis Ramirez" and the video shows RUBALCABA nodding his head up and down. RUBALCABA said he talked with RAMIREZ on the phone, but not on the prison phone.

70. Deputy Valenciano asked RUBALCABA how RAMIREZ makes his money and RUBALCABA replied, "He has all of us little dummies running around and doing whatever needs to be done." RUBALCABA said he uses JPay to send Ramirez money.

71. Deputy Martinez asked him what businesses are getting extorted and he replied, "about five." He further stated, "Its common sense, what places have online systems, illegal gambling" and "Smoke shops."

72. RUBALCABA said he managed RAMIREZ's money and that he gets to keep a portion of the money he earns on behalf of RAMIREZ. RAMRIEZ accused RUBALCABA of stealing money and told him to count the money in front of the cameras. RUBALCABA said, "It's retarded, arguing with him every day and he has a little kid attitude."

73. RUBALCABA said that "Bam Bam" is his business partner who helped him collect "taxes."

74. RUBALCABA said that RAMIREZ wanted to open the store that Person 1 operated and that the business was supposed to be "legitimate" and would be in RUBALCABA's name.

75. RUBALCABA said he was attracted to join the gang because he would have a gun, he would be "big and bad," "people

would fear [him]," and they would think he was "a big ol'
killer, robber."

76.  RUBALCABA also talked about his interactions with
Person 1.  RUBALCABA said that RAMIREZ tried to make him and
Person 1 "go against each other on some grimy shit."  RUBCALCABA
said, "at the end of the day, he tried to make me do something
to her and she escaped."  RUBALCABA said the following about the
kidnapping:

> [RAMIREZ] was pissed off and shit, so he told me to
> keep her, keep her at the shop.  But he wants me to
> put her butt naked, tie her up, take all her shit.
> And I just, I took her phones and I was like, just
> chill and talk to him and everything's gonna be fine.
> And just chill right here in the restroom because he
> told me to lock you up in here.

77.  RUBALCABA said Person 1 got out the back door and got
away.  RUBALCABA said that RAMIREZ was mad at him when Person 1
got away and told him he does not know "how to keep someone
hostage."

78.  RUBALCABA said he pays RAMIREZ about $5,000 every
month.

79.  RUBALCABA said that with Person 1, it started with
them approaching her and proposing a legitimate business
opportunity and potentially a non-profit organization.  At
first, he said, she was going to help them open up a legitimate
shop in her own name.

80.  RUBALCABA said that RAMIREZ's master plan was to open
a "massage parlor," which is why there was a stripper pole
inside RUBIDOUX FASHION.

**J.   Arrest of MARTINEZ and Seizure of SUBJECT DEVICE 17 on December 13, 2023.**

81.   On December 13, 2023, Riverside Sheriff's Department deputies were conducting surveillance on at a residence on Leyburn Place, Jurupa Valley, California when they saw MARTINEZ exit the residence and get into his grandmother's vehicle and drive away.  Riverside Sheriff's Department deputies conducted a traffic stop and arrested MARTINEZ, who was sitting in the front passenger seat. During a search of his person, deputies found and seized SUBJECT DEVICE 17.

**K.   RETAMOZA Tells Person 1 to Drop the Charges and "Don't Be Stupid"**

82.   While the kidnapping case was pending in state court against RAMIREZ, MARTINEZ, and case was pending in state court, before a court proceeding, on December 27, 2023, RETAMOZA, a WSR associate, came to court.[21]  RETAMOZA then approached Person 1 and said, "You better drop the fucking charges" and "Don't be stupid."  Person 1 then looked at an attorney who was sitting nearby.  That attorney then stood up and gestured to RETAMOZA by pointing away.  This encounter was captured on the court's video surveillance footage.

---

[21] RETAMOZA is documented as a WSR associate in an RSO Gang Report in case file GR2780001. I have read the report and spoke with RSO gang deputy Cesar Martinez who wrote the report. The report documents social media posts showing a photo of RETAMOZA holding a gun while flashing a "W" with his other hand while standing with J.C. and another WSR member. The "W" is a common gang sign standing for WSR.

## V.  **TRAINING AND EXPERIENCE ON GANGS ENGAGED IN RACKETEERING**

83.  Based on my training and experience and familiarity with investigations into gangs engaged in racketeering conducted by other law enforcement agents, I know the following:

a.  Extortion of illicit businesses as part of a racketeering enterprise involves numerous co-conspirators, from lower-level participants to higher-level managers.

b.  People engaged in racketeering often maintain books, receipts, notes, ledgers, bank records, and other records relating to their illegal activities, including their manufacture, transportation, ordering, sale and distribution of illegal drugs; revenue generated through the collection of extortionate taxes; and revenue generated through managing illegal gambling activities.  The aforementioned records are often maintained on cellphones and other digital devices.

c.  Communications between people engaged in racketeering often take place by telephone calls and messages, such as email, text messages, and social media messaging applications, sent to and from cellphones and other digital devices.  This includes sending photos or videos relating to racketeering activities.  In addition, it is common for people engaged in racketeering activities to have photos and videos on their cellphones of items relating to their criminal enterprises, including narcotics, gambling machines, and photos and videos relating to collecting taxes, as they frequently send these photos to each other and others to boast about their activities to bolster their position within the organization.

40

d.    People engaged in racketeering often keep the names, addresses, and telephone numbers of their associates on their digital devices.  People engaged in racketeering often keep records of meetings with associates, extortion victims, and narcotics suppliers on their digital devices, including in the form of calendar entries and location data.

e.    Individuals engaged in illegal racketeering activities often use multiple digital devices or quickly transition to new digital devices to facilitate racketeering activities if a digital device is seized by law enforcement.

### VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

84.  As used herein, the term "digital device" includes the SUBJECT DEVICES.

85.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are

replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

        b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, email, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

        c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

86.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

87.   In addition to what has been described herein, local law enforcement investigators secured state search warrants for SUBJECT DEVICE 1 through SUBJECT DEVICE 10 and SUBJECT DEVICE 13 through SUBJECT DEVICE 18.  Search efforts based on those warrants are still ongoing and the preliminary results of that searching has not been included in this affidavit in support of the application for warrants for the SUBJECT DEVICES.

## VII. **CONCLUSION**

88.  For all of the reasons described above, there is probable cause to believe that RAMIREZ, RUBALCABA, and MARTINEZ committed violations of 18 U.S.C. § 1959(a)(1) (Violent Crime in Aid of Racketeering) and 2(a) (Aiding and Abetting). Additionally, there is probable cause to believe that REMATOZA violated 18 U.S.C. § 3 (Accessory After the Fact to Kidnapping). There is also probable cause that the items to be seized described in Attachment B-1 will be found in a search of RUBIDOUX FASHION described in Attachment A-1.  Finally, there is also probable cause that the items to be seized described in Attachment B-2 will be found in a search of the SUBJECT DEVICES described in Attachments A-2, A-3, and A-4.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 2nd day of
May, 2024.

_____
HONORABLE SHERI PYM
UNITED STATES MAGISTRATE JUDGE